**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CORRINE HAMILTON** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14 C 1672 |
| | ) | |
| v. | ) | |
| | ) | |
| **CAROLYN COLVIN** | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Corrine Hamilton ("Plaintiff" or "Hamilton") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Acting Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for disability insurance benefits and supplemental security income under the Social Security Act in a November 29, 2012 written decision of Administrative Law Judge ("ALJ") Joel Fina. Hamilton appealed the ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner has filed a cross motion. Virtually no medical record exists other than scattered expert reports and assessments. The Court discusses this sparse record only to the extent necessary to elucidate its ruling. Plaintiff has amply discussed the relevant evidence in her motion.

Hamilton was a 36-year old woman at the time of the administrative hearing who has a long history of cognitive difficulties. She was placed in special education in school, which she left in the tenth grade. She has never obtained a G.E.D. Multiple psychological examinations revealed the extent of her challenges. IQ tests available at the time of the

hearing showed that she scored in the 61 range.  Follow-up exams done after the hearing gave Hamilton a score of 59.  That placed her in the lowest 0.30 percentile category and constitutes an "extremely low range of intellectual functioning." (R. 403).  Her perceptual reasoning was rated in the 0.40 percent range.  Hamilton's working memory was assessed at the lowest 0.10 percentage level.  (R. 403).  One psychologist assessed Plaintiff as functionally illiterate.  (R. 371).  Another diagnosed her as suffering from mild mental retardation.[1]  (R. 405).

Hamilton testified that she never obtained a driver's license because she could not read or understand the driver's handbook.  She cooks, washes dishes, and does laundry for herself and two of her children.  Hamilton experiences difficulties in counting change.  She works part-time.  Hamilton told the ALJ that she walks about 20 school children to the school lunchroom each day and watches them while they eat.  The job only requires one to one and a half hours daily.

## I.  <u>Legal Standard</u>

### A.  The Social Security Administration Standard

In order to qualify for DIB, a claimant must demonstrate that he is disabled.  An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 4243(d)(1)(A).  Gainful activity is defined

---

[1]  The Social Security Administration replaced "mental retardation" with "intellectual disability" in its listed impairments in 2013.  The Court uses the earlier term because the ALJ's decision, which pre-dates the 2013 changes, relies on it.

as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

### II. <u>Discussion</u>

Applying the five-step analytic procedure, ALJ Fina found at Step 1 that Hamilton had not engaged in substantial gainful activity since her alleged onset date of October 7, 1977 – 35 years prior to the ALJ's decision. Plaintiff's severe impairment at Step 2 was a cognitive disorder with borderline intellectual functioning. This impairment did not meet

or equal a listing at Step 3.  Before moving to Step 4, the ALJ found that Hamilton's testimony concerning the severity of her symptoms was not credible.  He also assessed various expert medical reports.  The ALJ adopted the statements of the testifying medical expert Dr. Michael Cremerius.  Little weight was assigned to a May 2011 state-agency assessment.  The ALJ assigned "some" weight to an assessment made by psychologist Dr. Kelly Renzi, who examined Hamilton after the administrative hearing.  The same limited weight was given to a report issued by Dr. Nicolette Puntini.  The ALJ then assessed Hamilton's RFC and found at Step 4 that she had no relevant past work.  Based on the testimony of a vocational expert, ALJ Fina determined at Step 5 that work existed in the national economy that Hamilton could perform.  He therefore concluded that she was not disabled.

Plaintiff challenges the ALJ's decision on only one ground.  ALJ Fina found at Step 3 that Hamilton did not meet or equal the criteria for listing 12.02 (organic mental disorders).  Hamilton claims that the ALJ erred by not considering subsections B and C of listing 12.05 (mental retardation).  In response, the Commissioner has submitted a motion that has given this Court considerable pause.  Its substantive portions include only three pages.  It cites no authority from this jurisdiction concerning the listing issue.  The Commissioner appears to assume either that this case is not worth defending, or that little discussion is needed to affirm the ALJ's decision.  Both are erroneous.  The first assumption should have resulted in a voluntary remand.  The second fails to recognize that the ALJ's decision is erroneous on its face.

Listing 12.05 provides in relevant part:

Mental retardation refers to significantly subaverage general intellectual

functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
. . . .

B.     A valid verbal, performance, or full scale IQ of 59 or less;

OR

C.     A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function[.]

Plaintiff contends that the ALJ never considered listing 12.05.  The Commissioner claims that he did.  The government argues that the only issue is whether substantial evidence supports the ALJ's alleged finding that Hamilton did not experience the "deficits of adaptive functioning" that are required by the listing's opening paragraph. The question of whether a claimant meets a listing is a medical judgment that requires consideration of an expert's opinion on the issue.  *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004).   "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Id*. at 669.

## A.     Listing 12.05(B)

The Court easily concludes that ALJ Fina did not meet the standard governing listing 12.05(B).  Medical expert Dr. Michael Cremerius testified at the administrative hearing. Neither the ALJ nor Dr. Cremerius ever addressed listing 12.05(B).  The medical expert may have thought that 12.05(B) was not at issue because Hamilton's IQ score at the time

was assessed at 61. Listing 12.05(B) requires an IQ of 59 or lower. After the hearing, however, psychological expert Dr. Kelly Renzi applied further IQ testing during a consultation exam with Hamilton. Dr. Renzi determined that Hamilton's overall score was 59, lower than the 61 number available to Dr. Cremerius. This new IQ score fell within the range of what listing 12.05(B) requires. The ALJ reviewed some aspects of Dr. Renzi's expert report in his decision. Surprisingly, however, he failed to note Hamilton's new IQ at all. The ALJ thus failed to identify the appropriate listing, did not account for the relevant evidence, and had no expert medical opinion on which to rely to reach the implicit finding that Hamilton did not meet or equal listing 12.05(B).

The ALJ might not have erred in doing so had he considered – and properly rejected – a finding that Hamilton had the "deficits in adaptive functioning" required by the opening paragraph of listing 12.05. Such deficits are prerequisites for each of the listing's four subsections that address the severity of a claimant's impairment. *See Jordan v. Comm. of Soc. Sec. Admin.*, 470 Fed.Appx. 766, 768 (11th Cir. 2012). For the reasons discussed below, the ALJ did not do so. The issue therefore requires remand because the ALJ failed to build a logical bridge between the record and his reasons for not addressing listing 12.05(B). His decision contains no discussion, much less one that is more than perfunctory, of the listing or the evidence relevant to it.

**B.    Listing 12.05(C)**

Listing 12.05(C) presents a different set of issues. Contrary to Plaintiff's claim, ALJ Fina did discuss certain aspects of the listing, which both he and Dr. Cremerius addressed in one form or another at the hearing and in the ALJ's decision. That said, the substance of their discussion raises serious questions as to what they thought 12.05 requires and

what standards they believed applied to its criteria. The Court thus begins with an overview of the listing's structural requirements.

The opening paragraph of listing 12.05 provides a capsule definition of mental retardation. *See*, *e.g.*, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) (characterizing the opening paragraph as a "diagnostic description for mental retardation"); *Durden v. Astrue*, 586 F. Supp.2d 828, 832 (S.D. Tex. 2008). It requires two things: (1) substantial subaverage intellectual functioning, and (2) deficits in adaptive functioning. Adaptive functioning is the key term. *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007). The Seventh Circuit defines a loss of adaptive functioning in a straight-forward manner as an "inability to cope with the challenges of ordinary everyday life." *Id.* Adaptive functioning involves behavioral areas such as "communication, self-direction, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, a[n]d safety." *Witt v. Barnhart*, 446 F. Supp.2d 886, 895 (N.D. Ill. 2006) (stating that a claimant must show a loss in at least two of these areas).

A claimant must meet both of these criteria, 68 Fed.Reg. 74279-01, at *74280, though a finding of mental retardation is not in itself sufficient to satisfy the listing. That is because a person who suffers from mild mental retardation may still be able to work despite his or her impairment. *See Muntzert v. Astrue*, 502 F. Supp.2d 1148, 1157-58 (D. Kan. 2007) ("DSM-IV and Listing 12.05(C) assume many, if not most, mildly mentally retarded individuals will be able to work."); *Thomas v. Comm. of Soc. Sec.*, 2010 WL 1254788, at *8 (N.D. Ohio March 25, 2010).

Subsections A, B, C, and D set out criteria for assessing the severity of the

8

claimant's impairment. The regulations stress that an ALJ must be alert to the way in which listing 12.05 differs in this respect from other mental disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) ("The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings."). The regulations point out that the four severity subsections must be considered as independent of the opening paragraph's diagnostic formula.[2] To meet listing 12.05, a claimant must satisfy both the opening paragraph's criteria and one of the standards set out in subsections A, B, C, or D. *See*, *e.g.*, *Jordan*, 470 Fed.Appx. at 768 ("As both the Listings and our cases make plain, a claimant must demonstrate both subaverage intellectual functioning and deficits in adaptive functioning, as well as satisfying one of the additional criteria, to prove entitlement to disability benefits under Listing 12.05."); *Roach v. Colvin*, 2013 WL 6170878, at *5 (N.D. Ind. Nov. 22, 2013); *Wright v. Astrue*, 2011 WL 1486208, at *6 (N.D. Ind. March 31, 2011).

Courts in this Circuit often incorporate the loss of adaptive functioning that is mentioned in listing 12.05's opening paragraph into the two requirements that are specifically set out in subsection C to yield a three-part test for meeting the required severity level of listing 12.05(C): (1) an IQ score between 60 and 70; (2) an additional

---

[2] Subsections A, B, C, and D do not themselves define what is necessary to find that a claimant suffers from mental retardation as some courts have implied. The language of listing 12.05 states that these subsections concern, not the definition of retardation, but the severity of that disorder. As the regulation implies, a disorder must first exist before its severity can be measured. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 ("The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied."). *See Randall v. Astrue*, 570 F.3d 651, 658 (5th Cir. 2009); *Haynes v. Colvin*, 2013 WL 6566524, at *4 (N.D.N.Y. Dec. 12, 2013); *Robinson v. Astrue*, 2010 WL 481045, at *12 (E.D. Mo. Feb. 4, 2010). The Fifth Circuit has laid particular stress on the fact that "Listing 12.05 does nothing to disclaim the distinction between an impairment's existence and an impairment's severity." *Randall*, 570 F.3d at 659.

physical or mental impairment that poses significant work-related restrictions; and, (3) deficits in adaptive functioning that exist before the claimant has turned 22. *Charette v. Astrue*, 508 Fed.Appx. 551, 553 (7th Cir. 2013); *Witt*, 446 F. Supp.2d at 894. *Witt* makes clear that each element of listing 12.05(C)'s three-part test is independent of the others and cannot be collapsed into a two-pronged analysis. *Witt*, 446 F. Supp.2d at 896. That means that "deficits in adaptive functioning" are not the same thing as the additional "work-related restriction" that must result from a mental or physical impairment that is in addition to mental retardation. The adaptive functioning deficits come from a claimant's mental retardation; the work deficits relate to an impairment that does not involve retardation. If that were not the case, the "work-related restriction" language that is unique to subsection C in listing 12.05 would be redundant.[3]

The regulations provide no guidance as to how severe a claimant's deficits in adaptive functioning must be under listing 12.05. *Durden*, 586 F. Supp.2d at 833. They certainly need not be "marked" limitations. *See Harrell v. Colvin*, 2015 WL 574006, at *9 n.7 (S.D. Fla. Feb. 11, 2015) ("Listing 12.05C does not require a claimant to show significant or marked deficits, rather, only 'deficits in adaptive functioning.'") (citing *Hill v. Comm. of Soc. Sec.*, 2015 WL 105097, at *8 n.6 (S.D. Ohio Jan. 7, 2015) (rejecting the position that "Listing 12.05 requires more than moderate deficits of adaptive functioning")).

---

[3] *Witt*'s requirement of a three-part test for 12.05(C) blurs the distinction between the two elements of the listing's opening paragraph and the severity criteria in A, B, C, and D. In this sense the Court disagrees that subsection C lays out a tripartite test. A claimant can only demonstrate that she meets 12.05(C) by showing four things: the two elements of listing 12.05's opening paragraph, plus the two criteria set out in subsection C. The result, however, is the same. A claimant must always demonstrate that she has deficits of adaptive functioning in order to meet listing 12.05, whether the deficit issue is considered separately from, or together with, sections A, B, C, or D.

"The Listing requirement is not *no* adaptive functioning but *deficits* in adaptive functioning." *Hendricks v. Astrue*, 2009 WL 648610, at *7 (S.D. Ind. March 11, 2009); *see also Kelley v. Colvin*, 2014 WL 524642, at *13 (N.D. Ind. Feb. 10, 2014) (noting that "deficits" does not mean that a claimant must have "significant deficits"). *But see Robinson v. Comm. of Soc. Sec.*, 2014 WL 3419309, at *8 (S.D. Ohio July 10, 2014) (explaining that the deficits cannot be merely trivial) (citing cases).[4]

Likewise, listing 12.05(C)'s language concerning a "significant work-related limitation of function" stemming from a claimant's additional mental or physical impairment does not impose a heavy burden on a claimant. Listing 12.05(C) applies the same standard that is used to determine if an impairment is severe at Step 2. *Smith v. Colvin*, 9 F. Supp.3d 875, 884 (E.D. Wis. 2014) (noting that "courts in this circuit now typically equate the two standards" used in listing 12.05(C) and Step 2). The regulations make the point clear. A claimant meets the standard of subsection C by showing that her additional impairment results in a limitation that "significantly limits your physical or mental ability to do basic work activities, *i.e.*, is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). A claimant only needs to show that her impairment imposes more than a slight or minimal restriction on her ability to work in order

---

[4]    Courts have not been clear on the precise relationship between adaptive functioning and the severity criteria outlined in section C (assessment of severity) of listing 12.00. Section C addresses, in part, "adaptive activities such as cleaning, shopping, cooking" and other activities. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C). Some courts have conflated the standards of section C with deficits in adaptive functioning, "[a]lthough it is not clear that the SSA intended these criteria to be synonomous with" that term. *Durden*, 586 F. Supp.2d at 834. The Court does not address this issue because the Commissioner has not raised it as a reason for affirming the ALJ's decision. As *Durden* points out, the elements of adaptive functioning are broader than the criteria of section C. *Id*. at 834 n. 4.

to meet that threshold.  *See*, *e.g.*, *Higgins v. Barnhart*, 42 Fed.Appx. 846, 849-50 (7ᵗʰ Cir. 2002); *Fanning v. Bowen*, 827 F.2d 631, 633 (9ᵗʰ Cir. 1987); *Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1515 (11ᵗʰ Cir. 1985).

These guidelines are critical in this case because the ALJ relied heavily on Dr. Cremerius' expert testimony concerning his assessment of how these factors applied to Hamilton's condition.  The problem is that Dr. Cremerius seriously misconstrued what listing 12.05(C) requires.  He never discussed Hamilton's deficits in adaptive functioning. Dr. Cremerius only described the work-related limitations related to two additional impairments that he thought Hamilton might have.  Those were a learning disorder (which may or may not have been what the ALJ meant by a cognitive disorder) and illiteracy (which Dr. Puntini diagnosed).  (R. 371).  Dr. Cremerius then told the ALJ that any limitations stemming from these impairments under listing 12.05(C) needed to meet the severity requirements laid out in listing 12.02.  (R. 46, "And those functional restrictions are outlined in 12.02 and she really doesn't meet that.").  Listing 12.02(B) states that a claimant meets the criteria for an organic mental disorder if she has, in part, at least two "marked" restrictions in her ADLs, social functioning, and concentration and/or repeated episodes of decompensation.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02(B).  Thus Dr. Cremerius and the ALJ both seem to have believed that Hamilton's work-related limitations under listing 12.05(C) had to be "marked."[5]

---

[5]  Listing 12.02(C) contains a separate set of criteria that only require the lower severity standard that applies at Step 2.  Dr. Cremerius' testimony does not suggest that this is what he referred to in his statements.  He claimed that Hamilton did not meet the severity standard because "somebody could, you know, maybe have moderate in ADLs, moderate in social, but they'd been markedly impaired in concentration, persistence and pace, or sometimes it's, you know, the marked is in the social like I said anxiety disorder

This was erroneous. Nothing in listing 12.05(C) requires marked limitations in a claimant's ability to work. Nor does Listing 12.05 ask an ALJ to refer to any requirement or standard mentioned in listing 12.02. As discussed above, subsection C's requirement of a "significant" work-related limitation employs the same standard that is used to determine whether an impairment is "severe" at Step 2 – more than slight or minimal. *Higgins*, 42 Fed.Appx. at 850. That is far lower than the "marked" restriction that Dr. Cremerius thought that Hamilton had to show.

The ALJ's oversight of the correct legal standard is made more problematic by his enigmatic treatment of the listing issue, both at the hearing and in his decision. The ALJ seems to have been interested in certain aspects of listing 12.05(C). He asked Dr. Cremerius if the record shed light on Hamilton's condition before she turned 22, as the listing requires.[6] The medical expert's response was not entirely clear. He told the ALJ that IQ scores generally remain stable throughout a person's lifetime. However, Dr. Cremerius (at least according the ALJ's interpretation) said that Hamilton did not have a

_____

would, would add to that and it would preclude being able to interact with people on any regular basis. . . . [T]here doesn't seem to be another impairment that would contribute to that." (R. 48). The Court interprets this less-than-clear statement to mean that Dr. Cremerius thought that Hamilton needed to show marked work restrictions, as required in listing 12.02(B). Insofar as the ALJ thought that Dr. Cremerius meant something else, he should have discussed what standard applied to this crucial issue.

[6] The Court notes that direct evidence from a claimant's developmental period is not necessary. "The final rules clarify that we do no necessarily require evidence from the developmental period to establish that the impairment began before the end of the developmental period. The final rules permit us to use judgment, based on current evidence, to infer when the impairment began. 65 Fed.Reg. 50746-01, at *50753 (2000).

mental impairment prior to age 22. The ALJ did not identify what impairment this referenced. Instead, he abruptly disagreed with this testimony in his decision, stating that "the evidence indicated a history of a mental disorder" before that time. (R. 25). He did not identify the disorder he thought existed. The ALJ then concluded his decision by stating that the record "does not depict any other mental impairment other than Claimant's cognitive impairment." (R. 28).

It is exceptionally difficult to grasp what the ALJ thought any of this was meant to address. The only listings that the ALJ considered in his decision were 12.02, which applied to Hamilton's cognitive disorder, and 12.05. Questions about Hamilton's condition before she turned 22 suggest an interest in listing 12.05 because only that listing asks an ALJ to consider whether the claimant's mental disorder began prior to age 22. Listing 12.02 does not require such an onset date. Nor does listing 12.02 ask anything about IQ scores before age 22. Listing 12.02(A) only inquires into whether the claimant has lost 15 IQ score points after the onset of morbidity. By contrast, listing 12.05 places IQ scores at the heart of a severity analysis. That was presumably the point of asking Dr. Cremerius if IQ scores remain stable over time. Such inquiries are frequently core elements in a discussion of listing 12.05. *See*, *e.g.*, *Fischer v. Barnhart*, 129 Fed.Appx. 297, 302 (7th Cir. 2005) (stating that "low IQ scores are indicative of retardation"). The stability of IQ scores over time can permit an ALJ to infer that the claimant suffered from mental deficiencies before age 22 in compliance with the requirements of listing 12.05(C), at least under certain circumstances. *Warren v. Colvin*, 565 Fed.Appx. 540, 544 (7th Cir. 2014) ("Because intellectual abilities are generally presumed to remain stable over time, the ALJ [could] have considered the likelihood that" a claimant's current IQ score was equally low at an

earlier age) (citing *Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001).[7]

Yet despite the fact that the ALJ's interest in these issues was only logically relevant to listing 12.05, it is not clear that is what he actually meant by his questions or his discussion. The ALJ concluded his decision by emphasizing that Hamilton only had a cognitive impairment under listing 12.02. (R. 28). That means that the mental impairment that the ALJ was interested in and said that Hamilton had before age 22 did *not* concern listing 12.05 but only 12.02. That renders his entire consideration of the issue superfluous at best. Why bother to make such elaborate inquiries into the issue of Hamilton's condition before age 22 if the ALJ thought he was addressing a cognitive disorder under 12.02? And why consider the stability of IQ scores over a lifetime when they played no role in the listing 12.02 analysis? The Court can only conclude that the ALJ did not properly understand the legal standard that applies to assessing whether a claimant meets or equals listing 12.02. The Court does not remand on this issue because Hamilton does not claim that the ALJ erred on it. Since the case requires remand on other grounds, however, the ALJ should account for the correct standard under listing 12.02 if he continues to believe that an assessment of its issues is relevant to Step 3.

--------------------------------

[7] The Seventh Circuit's approval of *Hodges* raises a secondary issue. The Eleventh Circuit found in that case that low IQ scores in adulthood can substitute for a showing of deficits in adaptive functioning prior to age 22. *See Hodges*, 276 F.3d 1266 ("[W]e find that a claimant need not present evidence that she manifested deficits in adaptive functioning prior to the age of twenty-two, when she presented evidence of low IQ test results after the age of twenty-two."). Not all circuits agree. *See Turner v. Comm. of Soc. Sec.*, 381 Fed.Appx. 488, 491-92 (6th Cir. 2010) ("[P]resent IQ scores do not serve as evidence that [a claimant] suffered from subaverage intellectual functioning or deficits in his adaptive functioning during his developmental period."); *Justice v. Barnhart*, 431 F. Supp.2d 617, 619 (W.D. Va. 2006) (discussing the Fourth Circuit's position); *see also Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012).

The ALJ's discussion also fails if he somehow intended his concern with Hamilton's condition before she turned 22 to address listing 12.05. The ALJ noted that listing 12.05(C) requires an additional impairment that interferes with a claimant's ability to work. He then stated that Hamilton had such an additional impairment in the form of "difficulty comprehending what she read." (R. 25). This presumably referred to Dr. Cremerius' testimony that Hamilton "might" be illiterate. The ALJ concluded that Hamilton did not meet this standard because (quoting Dr. Cremerius) "'her functional capacity is more adequate than would be required to meet [12.05].'" (R. 25, 46).

This brief assessment of listing 12.05(C) fails on three grounds. First, the ALJ did not understand that Dr. Cremerius had applied the wrong severity standard to listing 12.05(C). By quoting the medical expert as a justification for his finding, the ALJ incorporated Dr. Cremerius' assumption that work-related impairments had to be marked to meet the standard under 12.05(C). That was incorrect. Neither Dr. Cremerius nor the ALJ specifically assessed the limitations connected with Hamilton's illiteracy. The ALJ was required to consider whether illiteracy imposed more than slight of minimal work limitations on Hamilton. He could have done so if the decision suggested that the ALJ considered illiteracy as part of the Step 2 decision on what constituted a severe impairment. Such a consideration would have employed the same standard that is used to assess the severity of work-related limitation under subsection C. But the Court sees no basis for making such a conclusion. The Commissioner is silent on the issue.

Second, the ALJ never discussed, or even acknowledged, listing 12.05's opening definition of mental retardation. He merely jumped to the severity criteria of listing 12.05(C) without discussing the impairment itself. That is not necessarily erroneous, of course; an

ALJ may not have to address the issue of deficits in adaptive functioning if a claimant plainly cannot meet the specific criteria of listing 12.05(C). That is far from clear here. Moreover, the Commissioner's motion rests on the assumption that ALJ Fina *did* consider Hamilton's adaptive deficits and found them to be insufficient. The Court fails to understand how the government can make such a claim when the ALJ never even mentioned the term "deficits in adaptive functioning." The issue is critical to Hamilton's case. Three possibilities exist. If the ALJ did not consider her adaptive functioning, then he failed to build a logical bridge between the record and his claim that she did not meet listing 12.05. If he considered the deficits but found them to be insufficient, then the ALJ failed to explain the basis of his reasoning at all. If he thought they did exist, and that Hamilton did not meet the listing based on the additional criteria in listing 12.05(C), Hamilton's IQ score of 59 would make her presumptively disabled under listing 12.05(B) as discussed earlier. In each case, the ALJ erred.

Third, the ALJ may have thought that adaptive deficits were the same thing as work-related limitations under 12.05(C) and merely conflated the two issues in his truncated discussion of subsection C. That would explain his silence on an issue that the Commissioner claims he assessed. That would only mean, however, that the ALJ again misconstrued the legal standard that applies to listing 12.05. Thus, no matter which of these possibilities the ALJ may have intended, the decision requires remand.

The Commissioner fails to recognize this issue. The government argues instead that the ALJ properly considered and rejected a finding that Hamilton suffered from adaptive deficits based on three expert reports issued by the consulting psychologists in this case. The Court addresses each in turn.

The first involves an assessment issued by Dr. John Peggau. Dr. Peggau noted that Hamilton said that she could do household chores such as laundry, shopping, and cooking. The Commissioner has no basis for citing Dr. Peggau because the ALJ never relied on that psychologist for his Step 3 conclusions. Nor did he assess the expert's report under the factors set out in 20 C.F.R. § 404.1527. The Commissioner cannot defend an ALJ's decision on grounds that the ALJ himself did not rely on. *Parker v. Astrue*, 597 F.3d 920, 922 (7ᵗʰ Cir. 2010) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). The Seventh Circuit has made it exceptionally clear that the Commissioner's continued violation of this rule violates repeated warnings on the issue. *See*, *e.g.*, *Hanson v. Colvin*, 760 F.3d 759, 762 (7ᵗʰ Cir. 2014) ("This is professional misconduct and if it continues we'll have to impose sanctions."); *Hughes v. Astrue*, 705 F.3d 276, 279 (7ᵗʰ Cir. 2013) ("Characteristically, and sanctionably, the government's brief violates the *Chenery* doctrine.").

The government next relies on a report given by Dr. Nicolette Puntini. Dr. Puntini diagnosed Hamilton with mild mental retardation and found that her impairment would significantly limit Plaintiff's concentration, persistence, and pace. The Commissioner's only ground of objection is that Dr. Puntini did not explain why Hamilton's life activities supported a finding of mild retardation. This fails on multiple grounds. The ALJ never faulted Dr. Puntini for not explaining her reasoning on mental retardation. On the contrary, he recognized that Dr. Puntini made a diagnosis of retardation based on her interview and Hamilton's WAIS-IV test. (R. 27). The ALJ did not criticize her reasoning or question her diagnosis. Moreover, a formal diagnosis of mental retardation is not even necessary to find

that a claimant meets listing 12.05. *See*, *e.g.*, *Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007) ("[W]e have specifically held that a formal diagnosis of mental retardation is not required to fall within the confines of section 12.05.") (citation omitted); *Witt*, 446 F. Supp.2d at 895; *Cauffman v. Astrue*, 2010 WL 5464815, at *9 (W.D. Wash. Nov. 12, 2010).

In addition, the ALJ actually agreed with parts of Dr. Puntini's analysis. ALJ Fina, for example, adopted Dr. Puntini's conclusion that Hamilton's impairment posed difficulties in her ability to "to maintain occupational relationships." (R. 27). This undermines, rather than supports, the Commissioner's position. Finding that a claimant has limitations in her capacity to interact with co-workers is tantamount to finding that she has a loss in adaptive functioning. This obligated the ALJ to clarify whether this limitation stemmed from mental retardation or, as subsection C requires, it was related to an additional mental impairment such as the illiteracy issue that the ALJ briefly referred to in his discussion of listing 12.05(C).

The Commissioner also relies on the consultative report that Dr. Kelly Renzi issued after the administrative hearing. Dr. Renzi noted that Hamilton's IQ score of 59 fell within the range for mental retardation. However, Dr. Renzi did not think that diagnosis applied in this case because Hamilton's ability to communicate, socialize with others, and provide for self-care did not support it. That is to say, Dr. Renzi did not think that Hamilton had the necessary deficits in adaptive functioning to meet the standard for retardation. (R. 405, stating that Plaintiff did "not exhibit any concurrent deficits in adaptive functioning as far as her ability to communicate and socialize with others and provide for her own self-care and safety."). She found instead that Hamilton only suffered from borderline intellectual

19

functioning.  (R. 404-06).  The government claims this supports the ALJ's similar finding. It also contends that the ALJ did not err in a broader sense because a finding of borderline intellectual functioning is incompatible with a diagnosis of mental retardation.

These claims are without merit.  The Commissioner once again fails to account for what ALJ Fina said in his decision.  It is true that Dr. Renzi did not think Hamilton had serious difficulties interacting with others.  But the ALJ said that he only gave "some" weight to Dr. Renzi's expert report because he thought that Hamilton *did* have significant problems interacting appropriately with others.  (R. 27).  Indeed, this was one of the reasons that led the ALJ to limit Plaintiff's RFC to "brief and superficial interaction[s]" with others.  (R. 23).  The government cannot rely on a report that found no significant deficits in adaptive functioning when the ALJ plainly rejected that conclusion.

The Commissioner also overlooks that the ALJ's assessment of Dr. Renzi's report conflicts with his consideration of other parts of the record.  He gave some credit to Dr. Renzi's finding that Hamilton could understand, remember, and carry out "simple and complex instructions" (R. 27).  Dr. Renzi had essentially agreed with the state-agency expert's conclusion in May 2011 that Hamilton did not have significant limitations in her ability to remember or carry out simple instructions.  (R. 79).  Unfortunately for the Commissioner, ALJ Fina then issued conflicting assessments of the same findings.  He credited Dr. Renzi to some degree.  But he gave only "little" weight to the state-agency doctor because the ALJ thought that Hamilton was more limited than the non-examining expert thought.  These assessments are seriously at odds with one another.  The ALJ was obligated to explain how he went about assessing similar findings in two different ways. An ALJ always has the responsibility to reconcile conflicts in the medical record.  *Wilson*

*ex rel. J.D. v. Colvin*, 48 F. Supp.3d 1140, 1147 (N.D. Ill. 2014). In the absence of such an explanation, the Commissioner cannot rely on Dr. Renzi's report.

Nor can the Commissioner claim under these facts that the ALJ was exempted from considering mental retardation at Step 3 because he found at Step 2 that Hamilton had a cognitive disorder. The Commissioner cites the DSM-V to claim that a diagnosis of borderline intellectual functioning is incompatible with mental retardation. That is a well-recognized point that many courts have noted. *See*, *e.g.*, *Lyons v. Comm. of Soc. Sec.*, 2008 WL 4057858, at *8 (W.D. Mich. Aug. 28, 2008) (citing authorities). However, the fact than an ALJ concludes at Step 2 that a claimant only suffers from borderline intellectual functioning does not automatically mean that he is not required to consider the question of mental retardation at Step 3. *See McClellan v. Astrue*, 804 F. Supp.2d 678, 690 (E.D. Tenn. 2011) ("[A] conclusory step-two finding of borderline intellectual functioning does not excuse the ALJ from considering the extent of a claimant's intellectual impairments at subsequent steps. Put simply, step two is not the stage at which the ALJ should, without comment, make fine distinctions between two impairments, both supported by the record, which differ only in their degree."). The ALJ already thought that listing 12.05 was important enough to raise at the hearing and discuss in his decision, however deficient the result may have been. Having done so, he should have considered the issue properly. This would have included, among other things, applying the correct legal standard and stating reasons for adopting Dr. Cremerius' reasoning. Had the ALJ done so, he might well have decided that Hamilton's true severe impairment at Step 2 was mental retardation instead of borderline intellectual functioning. That would have required a Step 3 analysis of listing 12.05(C).

The government supports its position on this point by citing *Cox v. Astrue*, 495 F.3d 614 (8th Cir. 2007). *Cox* upheld an ALJ's finding that a claimant's adaptive functioning was more in line with borderline intellectual functioning than mental retardation. The Commissioner overlooks that the reasons that the Eighth Circuit cited for reaching its finding are not applicable here. *Cox* explained that the ALJ in that case correctly recognized that the claimant's IQ scores fell within the range of mental retardation. The ALJ then went on to discuss the claimant's adaptive functioning and to explain why it did not support a finding that the claimant had more than borderline intellectual functioning. *Id*. at 616-17. ALJ Fina failed to address these issues in any way. He did not acknowledge Hamilton's post-hearing IQ score of 59; did not address the deficits of adaptive functioning; did not recognize the problems in Dr. Cremerius' testimony; did not discuss the fact that Dr. Cremerius noted that some of Hamilton's scores were in the range of mental retardation; and never said why he disagreed with Dr. Puntini's diagnosis of retardation. The government's argument appears to be that, because the medical standard for diagnosing mental disorder states that mental retardation and borderline functioning are incompatible, the ALJ was simply free to ignore these lines of evidence. As the Commissioner's own case authority warns, though, "the medical standard for mental retardation is not identical to the legal standard." *Id*. at 618 n. 4. It was the ALJ's duty to account for the record and apply the correct standard. He clearly failed to do so.

Part of the ALJ's flawed discussion of these issues involves his consideration of Hamilton's credibility. The ALJ said that Hamilton claimed that she was unable to perform "any work-related activity." (R. 25). That is incorrect. Hamilton never claimed that she

could not undertake *any* work. She described the part-time work that she was already performing during the lunch hour at a nearby school. Her point was that she could not do more than this very limited set of activities involved. The ALJ thought that she was unbelievable because she could work for a brief period every day. That, too, was incorrect. It is well established that a claimant's ability to work part time is not evidence that she can work full time. *See*, *e.g.*, *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) ("There is a significant difference between being able to work a few hours a week and having the capacity to work full time."); *Carradine v. Barnhart*, 360 F.3d 434, 435 (7th Cir. 2003); *Allen v. Astrue*, 869 F. Supp.2d 924, 940 (N.D. Ill. 2012). Hamilton's ability to work a few hours a day was certainly relevant to her credibility. However, the ALJ could not jump from that fact to a finding that she was not credible without explaining the basis of his reasoning. He provided none. Since this was the ALJ's only reason for finding Hamilton to be non-credible, his assessment is patently wrong and requires remand.

### III. Conclusion

For all these reasons, Plaintiff Corrine Hamilton's Motion for Summary Judgment [13] is granted. The Commissioner's Motion for Summary Judgment [18] is denied. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The ALJ is directed to (1) reconsider whether Hamilton meets or equals listing 12.05 by accounting for the full record, (2) state more clearly his reasons for the weight assigned to Dr. Cremerius, (3) resolve the conflict in the weights given to the state-agency expert and Dr. Renzi, and (4) properly explain the basis used for assessing Plaintiff's credibility.

ENTER:

_____

DANIEL G. MARTIN
United States Magistrate Judge

Dated: August 10, 2015.